MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
     knye@mcrazlaw.com
By:   Michael McGrath, #6019
      Kasey C. Nye, #20610

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Phone: (303) 223-1100
Fax: (303) 223-1111
Email: mpankow@bhfs.com
     jhantman@bhfs.com
By:   Michael J. Pankow (Co. # 21212)
      Joshua M. Hantman (Co. # 42010)

Proposed Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>REGIONAL CARE SERVICES CORP.,<br>    Debtor. | Chapter 11 Proceedings<br><br>No. 4:14-bk-01383-EWH |
| In re:<br>CASA GRANDE COMMUNITY<br>HOSPITAL D/B/A CASA GRANDE<br>REGIONAL MEDICAL CENTER,<br>    Debtor. | No. 4:14-bk- 01384-BMW |
| In re:<br>REGIONAL CARE PHYSICIAN'S<br>GROUP, INC.,<br>    Debtor. | No. 4:14-bk-01385-EWH |
| In re:<br>CASA GRANDE REGIONAL<br>RETIREMENT COMMUNITY,<br>    Debtor. | No. 4:14-bk-01386-EWH |

## OMNIBUS DECLARATION OF RONA CURPHY
## IN SUPPORT OF FIRST DAY MOTIONS

I, Rona Curphy, submit this Declaration of Rona Curphy in Support of Chapter 11 Petition and First Day Motions (the "**Declaration**"). On February 4, 2014 (the "**Petition Date**"), Regional Care Services Corp. ("**RCSC**"), Casa Grande Community Hospital

d/b/a Casa Grande Regional Medical Center ("**CGRMC**" or the "**Hospital**"), Regional Care Physician's Group, Inc. ("**RCPG**"), and Casa Grande Regional Retirement Community ("**CGRRC**") (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

In support of the first day motions in these cases (the "**First Day Motions**"), I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the President of RCSC and President/Chief Executive Officer of each of the Debtors, each a non-profit corporation organized under the laws of the State of Arizona.

2.      I have served as President and/or Chief Executive Officer of each of the Debtors since 2009 and I am familiar with their respective day-to-day operations, business and financial affairs.

3.      The Debtors intend to continue in possession of their property and management of their respective businesses as debtors-in-possession. In order to enable the Debtors to operate effectively post-petition and to minimize adverse effects from their chapter 11 filings, the Debtors have requested relief in the form of the First Day Motions.

4.      I submit this Declaration: (a) in support of the relief requested in the First Day Motions and (b) to explain to the Court and parties the facts and circumstances that have compelled the Debtors to seek relief under the Bankruptcy Code. Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from the Debtors' business records or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial conditions. With respect to the business records relied upon in my testimony, I am a custodian of records and am familiar with the Debtors' recordkeeping system. Those business records are comprised of memoranda, reports, records, and data compilations recording acts or events at or near the time the acts or events took place, transmitted by employees with personal knowledge of the events or

acts, and recorded in the ordinary course of Debtors' business activity. It is our regular practice to keep such records. The statements set forth below are true to the best of my knowledge and, if called to testify as to those statements, I could do so competently. I am duly authorized to submit this Declaration.

5.     Part I of this Declaration provides background with respect to the Debtors' business, as well as the events leading up to the commencement of this case. Part II sets forth the relevant facts supporting the Debtors' First Day Motions.

## PART II - BACKGROUND

**A.     Introductory Statement**

6.     The Debtors commenced these cases in order to effectuate a sale of the hospital and substantially all of their other assets to Banner Health ("**Banner**") (the "**Banner Transaction**"). With this transaction, and by bringing the Hospital under the Banner umbrella, the Debtors expect to be able to (1) ensure continued availability of outstanding medical care to the Casa Grande community, (2) preserve jobs for the Debtors' approximately 800 employees, and (3) generate cash in an amount that, by current projections, should be sufficient to pay creditors in full. The Banner Transaction is proposed in response to significant financial challenges facing this and other hospitals, and comes after a considerable effort in searching for purchasers or strategic partners conducted for the benefit of creditors and the community the Debtors serve.

7.     The proposed sale to Banner contemplates confirmation of a Chapter 11 Plan of Reorganization under the supervision of this Court. Banner has already provided a significant bridge loan and has agreed to provide additional needed working capital pending completion of the Chapter 11 process and other regulatory approvals in the form of a debtor-in-possession loan. Both the bridge loan and the debtor-in-possession loan will be forgiven upon closing of the sale. The purpose of the relief requested on an emergency basis at the commencement of this case is to ensure continuation of Hospital

3

operations in the ordinary course and to permit the transactions associated with continued delivery of quality patient care.

8.     The Debtors are non-profit health care providers.

9.     It is anticipated that the proposed sale to Banner will occur through a Plan of Reorganization that the Debtors anticipate filing shortly.

10.     It is currently anticipated that the Debtors' Plan of Reorganization will be a full or close to full repayment plan to all creditors.

**B.     The Hospital (CGRMC)**

*1.     Services*

11.     CGRMC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. CGRMC was incorporated in November 1981 and is sponsored by RCSC.

12.     CGRMC operates a 177-licensed bed, general acute care Hospital located in Casa Grande, Arizona. CGRMC's medical center campus includes the Hospital building, Desert Reflections Outpatient Imaging Center, four medical office buildings, and the Pavilion. Approximately 19,000 square feet of the 39,000 square foot Pavilion is used by CGRMC, and the remainder is leased to other health care providers.

13.     CGRMC also operates a 12,500 square foot urgent care center (the "**Urgent Care Center**") at a site near the main campus.

14.     CGRMC offers a broad range of services for acute care and ancillary services in both inpatient and outpatient settings, with a significant amount of outpatient services provided at the Urgent Care Center. CGRMC, in conjunction with RCPG, provides a wide range of medical specialty services including cardiology, gastroenterology, gynecology, neurology, obstetrics, pediatrics, surgery, intensive care and urology.

15.     CGRMC's medical staff includes approximately 167 physicians, 81% of whom are board certified in their specialty. The medical staff includes eleven (11)

1  hospitalists that are contracted through a third-party. CGRMC employs one

2  anesthesiologist and its affiliate RCPG employs six physicians: two general surgeons, one

3  general and vascular surgeon, one OB/GYN physician, one GYN physician and one

4  neurologist. CGRMC also has contracts with five independent anesthesiologists and a

5  group of five Certified Registered Nurse Anesthetists (CRNAs).

6        16.     CGRMC is also the signatory for the Hospital's leases.

7        **2.**    *Licensure and Accreditations*

8        17.     CGRMC is licensed by the Arizona Department of Health Services through

9  June 2015 and accredited by various organizations. CGRMC is accredited by Det Norske

10  Veritas Healthcare (DNV) through April 2014. CGRMC's mammographic imaging and

11  ultrasound services are accredited by the American College of Radiology through

12  September 2014 and October 2016, respectively. CGRMC's laboratory has been

13  accredited by the College of American Pathologists through February 2014. CGRMC's

14  sleep lab is accredited by American Academy of Sleep Medicine.

15  **C.**    **Background on Other Debtor Entities**

16        18.     RCSC is an Arizona non-profit corporation that is exempt from federal

17  income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as

18  amended. RCSC was incorporated in 1997 for charitable and educational purposes, and

19  has the purpose of benefiting, performing the functions of, and carrying out the purposes

20  of the medical care in the community. RCSC is the sole member and sponsor of

21  CGRMC, RCPG, and CGRRC. The RCSC board of directors consists of five members

22  (four independent members and one physician). As of the Petition Date, RCSC's

23  management consists of Rona Curphy as President , Karen Francis as Chief Financial

24  Officer, Cherie McGlynn as Chairman, David Fitzgibbons as Vice Chairman, and John

25  Robert McEvoy as Secretary/Treasurer.

26        19.     CGRRC is an Arizona non-profit corporation that is exempt from federal

income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as

5

1  amended. CGRRC was incorporated in 1989 with the purpose of, among other things,

2  providing elderly and handicapped persons housing facilities and services specially

3  designed to meet specific physical, social, and psychological needs. The organization's

4  central purpose also included support for charitable, educational, and other exempt

5  activities of CGRMC and Central Arizona Medical Center. CGRRC is the borrower on

6  the loan for the urgent care building utilized under Hospital operations but there has been

7  no activity in this organization since 2005. As of the Petition Date, CGRRC's

8  management consists of Rona Curphy as President/CEO, Cherie McGlynn as Chairman,

9  David Fitzgibbons as Vice Chairman, and John Robert McEvoy as Secretary/Treasurer.

10     20.    RCPG is an Arizona non-profit corporation that is exempt from federal

11  income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as

12  amended. RCPG was incorporated in 2008 with the purpose of providing medical

13  services, medical programs and health care for the benefit of patients in the service area

14  of Casa Grande, and to manage the operations of employed physicians that had formerly

15  been under CGRMC's operations. As of the Petition Date, RCPG's management consists

16  of Rona Curphy as Chief Executive Officer and Karen Francis as Chief Financial Officer.

17  RCPG currently employs six physicians.

18  **D.    Events Leading to Chapter 11 Filing**

19         *1.    Financial Challenges*

20     21.    The Arizona Health Care Cost Containment System ("**AHCCCS**") is

21  Arizona's Medicaid program. AHCCCS oversees contracted health plans in the delivery

22  of health care to individuals and families who qualify for Medicaid and other medical

23  assistance programs. AHCCCS, through its contracted health plans, pays hospitals and

24  other health care providers for inpatient and outpatient services provided to AHCCCS

25  members. Additionally, AHCCCS makes supplemental payments to hospitals for

26  different purposes and activities. In 2011, AHCCCS's per diem reimbursement rates were

reduced by more than ten percent. Effective October 1, 2011, AHCCCS eliminated

reimbursement for AHCCCS-eligible patients after the twenty-fifth day of any inpatient treatment at a hospital or long-term acute care facility during the federal fiscal year from October 1st through September 30th. AHCCCS also eliminated coverage for otherwise eligible patients who do not have dependent children. These changes resulted in a dramatic decrease in the Hospital's AHCCCS reimbursement for the medical services it provides to these indigent patients. CGRMC estimates that these changes resulted in a decline of its revenue in excess of $10 million from 2011 to 2013. These AHCCCS changes also resulted in decreases in supplemental federal reimbursements linked to treatment of Medicaid-eligible patients of an additional $1 million annually.

22.    Other external factors have also led to declining revenues, including the industry-wide migration of treatment from inpatient to outpatient settings (which are reimbursed at significantly lower rates) and the 2% across the board reduction in Medicare reimbursement rates due to the federal budget sequestration,

23.    For the fiscal year ended June 30, 2013, the Hospital's net patient service revenue declined by over 11% from 2011 levels.

24.    In the first six months of the current fiscal year, inpatient admissions have declined by approximately 15%, compared to the same period in the prior year resulting in a further reduction in revenue.

25.    These changing dynamics have substantially impacted CGRMC's operating margins and liquidity over the last two and one-half years.

26.    The Debtors have significant debt obligations, including bond obligations in the aggregate principal amount of $63.8 million. As a result of these financial challenges, the Debtors violated certain bond covenants beginning on June 30, 2013.

27.    The Debtors' business is very seasonal with patient volumes ramping up in the late Fall and Winter and dropping off in the Spring, mirroring the population of the community. As a result of this seasonality, CGRMC's working capital needs increase significantly as it increases its staffing levels, purchased supplies and services to provide

1 care for patients well in advance of receiving reimbursement from Medicare, AHCCCS,
2 commercial insurers and other payers.

3     28.    Notwithstanding the financial challenges that CGRMC faces, the local
4 community's need for its medical services is critical. CGRMC is the primary medical
5 service provider in its service area, with an overall market share of approximately 59% in
6 2012. For the 12 months ended June 30, 2013, CGRMC admitted over 7,600 patients and
7 had over 58,000 emergency room and urgent care visits.

8     *2.    Review of Strategic Options*

9     29.    In the summer of 2013, CGRMC commenced an intensive review of
10 strategic options that would ensure that CGRMC could continue providing quality health
11 care to the Casa Grande community and surrounding areas and that the Debtors' creditor
12 obligations would be satisfied.

13     30.    CGRMC and other hospitals who had been negatively impacted by the
14 2011 changes in AHCCCS applied to the federal government for a provider tax
15 assessment program that was expected to generate an incremental $11,756,252 of net
16 income to the Hospital for the last three quarters of fiscal year 2013 and first 2 quarters in
17 fiscal year 2014. This application was not approved by the appropriate government
18 agencies.

19     31.    CGRMC pursued a refinancing of its bonds through a federal program that
20 would have reduced its financing costs by over $2.5 million annually predicated on a
21 successful implementation of the provider tax assessment program. This refinancing
22 effort ultimately failed when the provider tax was not approved.

23     32.    CGRMC also pursued a strategic partnership with a for-profit hospital
24 system based in Brentwood, Tennessee. This effort ultimately failed.

25     33.    In May 2013, CGRMC retained Hammond Hanlon Camp ("**H2C**"), a
26 leading financial advisor and investment banker for hospital and health systems, to assess
CGRMC's strategic and restructuring options.

34. CGRMC concluded that it would have inadequate cash to continue operations and was forced to evaluate all strategic options, including filing for bankruptcy. Nevertheless, CGRMC continued to search for other strategic partners and options that would avoid insolvency.

35. In October 2013, on behalf of CGRMC, H2C contacted twenty potential strategic partners, fifteen of which received CGRMC's confidential information memorandum describing CGRMC, its operations, the Casa Grande market, and the Hospital's financial condition. Six of the recipients submitted an indication of interest in CGRMC, including Banner, another potential not-for-profit strategic partner, and four for-profit health systems. Ultimately, Banner and three other potential strategic partners submitted proposed term sheets for a potential partnership.

### 3. *Parallel Process for Obtaining Bridge Financing*

36. While conducting an extensive review process for finding a potential strategic partner, CGRMC conducted a parallel process for obtaining bridge financing in order to secure working capital for the Hospital. Although the Debtors explored obtaining bridge financing from the bondholders and other independent financing sources, obtaining bridge financing outside of a bankruptcy proceeding was not practical unless the lender was willing to advance on an unsecured basis. CGRMC negotiated proposals from two potential strategic partners to provide bridge financing to CGRMC to cover the cost of operations while the potential strategic partner and CGRMC negotiated the terms of a letter of intent and definitive sales agreement.

### 4. *The Banner Transaction*

37. The CGRMC Board considered numerous factors in choosing a strategic partner, including the likelihood of satisfying creditor claims, execution risk, transition of the assets from the Debtors as a non-profit to Banner as a non-profit, and CGRMC's mission, and determined that Banner presented the best option to satisfy the Debtors' creditor obligations and continue CGRMC's mission to provide and expand quality

1  health care to the Casa Grande community and surrounding areas in a caring and
2  compassionate environment.

### a.  About Banner

4  38.  Banner is a non-profit health system headquartered in Phoenix, Arizona
5  that operates 24 hospitals and health care facilities in Alaska, Arizona, California,
6  Colorado, Nebraska, Nevada and Wyoming, in addition to the Banner Health Network
7  and Banner Medical Group.  It currently employs approximately 36,000 individuals.
8  Banner provides a strong financial option for CGRMC, with operating revenue of $5.1
9  billion, operating earnings before interest, taxes, depreciation and amortization of $688.4
10  million (a 13.6% margin), cash and investments of $3.6 billion, almost 300 days cash on
11  hand, and an Aa3/AA- rating.  Significantly, the substantial capital of reserves on hand
12  shows financial strength and ability to make needed capital investments.  As important,
13  Banner's non-profit mission of making a difference in people's lives through excellent
14  patient care, and reinvesting all of its earnings back into improving patient care, aligns
15  directly with CGRMC's mission.

### b.  LOI & Bridge Financing

17  39.  On December 27, 2013, the Debtors and RCSC's subsidiary, RHCV, signed
18  a letter of intent (the "**LOI**") with Banner for Banner to purchase substantially all of the
19  assets of the Debtors. A key consideration of the LOI was Banner's commitment to hire
20  substantially all of the Debtors' employees for at least 6 months post-closing, ensuring
21  both continuity of employment for these individuals, the avoidance of significant
22  employee claims and continuity of care for the patients they serve. In anticipation of a
23  potential bankruptcy filing, Banner agreed to provide a temporary line of credit up to
24  $3,308,000 ("**Prepetition Financing**") to finance the Debtors' operations for the period
25  between the signing of the LOI and the Petition Date.

26

1

               c.      Description of the Asset Purchase Agreement

2        40.     Pursuant to the Asset Purchase Agreement, dated as of February 4, 2014,

3 by and between Banner and the Debtors (the "**APA**"), Banner and the Debtors agreed that

4 Banner will acquire, among other things, substantially all of the Debtors' assets (as more

5 specifically set forth in the APA, the "**Transferred Assets**") and assume certain

6 liabilities (the "**Sale**"). Banner agreed to pay to the Debtors up to $87 million dollars to

7 pay allowed claims, or such lesser amount needed to pay all such claims in full

8 (excluding postpetition interest on unsecured claims), through the Plan (the "**Purchase**

9 **Price**").

10        41.     It is anticipated that all creditors will be paid in full or close to full through

11 the sale to Banner.

12        42.     At closing of the Sale, the Purchase Price amount will be placed in escrow

13 and distributed to creditors in accordance with the Purchase Agreement and this Court's

14 order confirming the Debtors' Joint Plan of Reorganization filed with the Court.

15           d.     The DIP Loan & Payment of All Claims

16        43.     To provide the Debtors with sufficient capital to operate pending the Sale,

17 Banner agreed to provide the Debtors with financing, in addition to the Prepetition

18 Financing, in the form of: (1) unsecured postpetition financing on an interim basis (the

19 "**Interim DIP Financing**"); and (2) unsecured postpetition financing on a final basis up

20 to an aggregate principal amount of $6,199,845[1] upon entry of a final order (the "**DIP**

21 **Financing**").

22        44.     The DIP Financing and Interim DIP Financing are critical to the Debtors'

23 operations and ability to fund these chapter 11 cases pending the anticipated sale of

24 substantially all of their assets to Banner.

25

26

---

[1] As more fully described in the motion, the aggregate principal amount of the Phase 2 DIP Financing and Phase 1 Bridge Financing (defined below) together is not to exceed $9,507,845.

45.    Debtors need immediate additional capital (i) for ordinary course operations, such as funding payroll for doctors, nurses and other staff, purchasing medical supplies and pharmaceuticals, paying for blood supplies, maintaining utilities, and paying vendors critical to operations, and (ii) to pay administrative expenses, including U.S. Trustee and professionals' fees.  Such payments are necessary to sustain the going-concern value of the Debtors' assets and ensure a successful Sale, which in turn will help maximize ultimate recovery for the Debtors' creditors.

e.    Impact of the Sale on the Community

46.    In making the decision to partner with Banner, the transaction's impact on the Hospital's mission and Casa Grande community was just as important to CGRMC as the financial considerations.  Banner has committed to using its commercially reasonable best efforts to maintain the Hospital operations as an accredited general service Hospital servicing the city of Casa Grande and Pinal County.  It will also use its commercially reasonable best efforts to institute health, wellness and outreach programs consistent with its approach to the other communities it serves, and to deploy Banner's care management and quality infrastructure in the Hospital operations so that the care provided is similar to all other Banner hospitals. Banner will also incorporate the Hospital into Banner's standard capital allocation process for prioritizing and funding the capital needs of Banner's facilities.

47.    Banner has also agreed to maintain an advisory board composed of Casa Grande community representatives to advise Banner's local management team on matters of community need and interest, and to use its commercially reasonable best efforts to successfully consummate the extension and enhancement of key services at the Hospital, including women's and infant services, emergency/trauma, enhanced telehealth capabilities, and an interventional cardiology STEMI program.  Moreover, Banner will maintain the Casa Grande Community Hospital Foundation, Inc. (the "**Foundation**") in its present form under the management of the Banner Health Foundation, substantially

1    maintain the existing Foundation Board in place, and endeavor to ensure continued

2    operation of the Foundation consistent with donor intent and applicable tax and non-

3    profit laws. In the event the Foundation ceases to be financially viable and is ultimately

4    merged into Banner Health Foundation, Banner would, among other things, become

5    responsible to honor donor intent with respect to restricted funds of the Foundation.

6        48.    Ultimately, the Banner Transaction is the best option to satisfy the Debtors'

7    obligations to creditors and continue CGRMC's commitment to providing quality health

8    care to the Casa Grande community and surrounding areas in a caring and compassionate

9    environment.

10                   **PART III - SUMMARY OF FIRST DAY MOTIONS**[2]

11        49.    To enable the Debtors to operate effectively and to minimize adverse

12    effects from their chapter 11 filing, the Debtors have filed the motions and applications

13    described below.

14        50.    In connection with preparing for this case, I have reviewed each of the First

15    Day Motions referenced below. The First Day Motions were prepared with my input and

16    assistance, or the input and assistance of employees working under my supervision. To

17    the best of my knowledge, the information contained in the First Day Motions is accurate

18    and correct. As set forth below, granting the relief requested in the First Day Motions is

19    critical to the Debtors' ability to preserve the value of their estate, succeed in their

20    reorganization efforts, and continue to provide quality care to their patients.

21    **B.    Motions Related to Retention of Professionals and Administration**

22            *1.    Expedited Motion for Joint Administration of Estates and Transfer*
                 *of Cases to One Judge*
23

24        51.    While some of the Debtors are not operating entities, the functions of all are

25    interrelated with creditors typically dealing with the Debtors as one hospital entity.

26

---

[2] Capitalized terms used but not defined in this section have the meanings given them in
the relevant First Day Motion.

52. Joint administration of these Cases will not result in any prejudice to the Debtors' creditors or other parties-in-interest. In fact, joint administration of these Cases would facilitate the administration process and would ease the burden and expense of administering the estates.

53. All the Debtors are seller entities in the contemplated Sale.

### 2. Application to Employ and Retain Brownstein Hyatt Farber Schreck, LLP

54. Concurrently herewith, the Debtors have filed a motion to retain Brownstein Hyatt Farber Schreck, LLP ("**BHFS**") as bankruptcy counsel with regard to the filing and administration of these Cases. In September 2013, BHFS was retained by the Debtors to represent them in connection with CGRMC's pursuit of a strategic partnership with a for-profit hospital system based in Brentwood, Tennessee. Upon termination of transaction negotiations, the BHFS engagement transitioned into BHFS representing Debtors in connection with general restructuring matters, including the preparation for and potential commencement of these Cases. The Debtors' desire to employ BHFS in order to continue providing such restructuring advice as is necessary and requested by the Debtors, including, without limitation, bankruptcy, debt restructuring, and related corporate and litigation services. BHFS has become familiar with the Debtors' operations and business due to the legal services it provided to the Debtors prepetition. Accordingly, I believe BHFS is well-qualified to represent the Debtors in these Cases.

### 3. Application to Employ and Retain Mesch, Clark and Rothschild, P.C.

55. The Debtors have also filed a motion to retain Mesch, Clark and Rothschild, P.C. ("**MCR**") as local bankruptcy counsel with regard to the filing and administration of these Cases. MCR was retained by the Debtors to represent them as

1  local counsel in connection with any bankruptcy proceedings. The Debtors desire to

2  employ MCR in order to serve as local counsel during the pendency of these Cases. MCR

3  regularly represents both debtors and creditors in bankruptcy matters, including Chapter

4  11 proceedings in the United States Bankruptcy Court for the District of Arizona.

5  Accordingly, I believe MCR is well-qualified to represent the Debtors as local counsel in

6  these Cases.

7   ### 4.    *Application to Employ and Retain Hammond Hanlon Camp, LLC*

8   ### *("H2C")*

9  56.    The Debtors have also filed an application to employ and retain H2C as

10  investment banker to the Debtors. In August 2012, the Debtors employed H2C as their

11  investment banker in order to pursue strategic and restructuring options for the Debtors.

12  H2C is a pre-eminent investment bank in the health care industry regularly representing

13  hospitals and health systems in strategic assessments, mergers and acquisitions, and

14  bankruptcy and restructuring matters.  H2C represented CGRMC in its review of options,

15  search for a purchaser, and search for working capital financing.  Accordingly, I believe

16  H2C is well-qualified to provide financial advisory services to the Debtors in this matter.

17   ### 5.    *Application to Employ and Retain Grant Thornton, LLP*

18  57.    The Debtors have also filed an application to employ and retain Grant

19  Thornton, LLP ("**GT**") as financial advisors to the Debtors. In October 2012, the Debtors

20  employed Grant Thornton, LLP as their financial advisor as the Debtors pursued strategic

21  and restructuring options. The Debtors desire to employ GT in order to continue

22  providing such restructuring advice as is necessary and requested by the Debtors,

23  including, without limitation, bankruptcy and debt restructuring. GT has become familiar

24  with the Debtors' operations and business due to the restructuring services it provided to

25  the Debtors prepetition. GT regularly provides restructuring services to hospitals and

26  health systems.  Accordingly, I believe GT is well-qualified to provide restructuring

services to the Debtors in this matter.

### 6. Application to Employ and Retain Epiq Bankruptcy Solutions, Inc.

58.     The Debtors have also filed an application to employ and retain Epiq Bankruptcy Solutions, Inc. ("**Epiq**") to provide administrative support services to the Debtors in preparing disclosure schedules and financial statements, managing proofs of claim and proofs of interest, and preparing and serving required notices. Epiq regularly provides corporations, including health care providers, with bankruptcy support services in large, complex bankruptcy proceedings. Accordingly, I believe Epiq is well-qualified to provide bankruptcy administrative support services to the Debtors in this matter.

## C.     Motions Related to Cash Management and Financing of Operations

### 1. Emergency Motion for Entry of Stipulated Interim Order (I) Granting Interim Use of Cash Collateral, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363, 365, and 507, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)

59.     The Debtors are obligated on the following bond financing documents in the aggregate principal amount of approximately $63.785 million:

    i.    a certain Master Indenture of Trust dated July 1, 2001 (as supplemented and amended, the "**Master Indenture**"), by and between the Debtors and Wells Fargo Bank, National Association[3], not individually but as master trustee (the "**Master Trustee**");

    ii.    certain "Obligations" (as defined in the Master Indenture), in the form of promissory notes, made by CGRMC pursuant to the Master Indenture;

    iii.    a certain Bond Indenture, dated July 1, 2001 (as supplemented and amended, the "**Bond Indenture**"), by and between the Industrial Development Authority of the City of Casa Grande (the "**Authority**") and Wells Fargo Bank, National Association, not

---

[3] Wells Fargo Bank Arizona, National Association was the original master trustee under the Master Indenture. Wells Fargo Bank Arizona, National Association thereafter changed its name to Wells Fargo Bank, National Association.

individually, but as bond trustee (the **"Bond Trustee"** and, together with the Master Trustee, the **"Trustee"**);

iv.    a certain Deed of Trust and Assignment of Rents with Security Agreement dated August 1, 2001 (as supplemented and amended, the **"Deed of Trust"**), pursuant to which CGRMC granted a lien on its interest in the "Casa Grande Hospital Site," all "Buildings and Improvements" thereon, all "Collateral," and all "Fixtures" (each as defined in the Deed of Trust)(to the extent such liens are valid, enforceable, perfected and avoidable, the **"Prepetition Collateral"**);

v.    those certain Hospital Revenue Refunding Bonds (Casa Grande Regional Medical Center), Series 2001A (the **"2001A Bonds"**), issued pursuant to the Bond Indenture in the initial aggregate principal amount of $41,845,000;

vi.    those certain Hospital Revenue Refunding Bonds (Casa Grande Regional Medical Center), Series 2001B (the **"2001B Bonds"**) issued pursuant to the Bond Indenture in the initial aggregate principal amount of $4,645,000;

vii.    those certain Hospital Revenue Bonds (Casa Grande Regional Medical Center) Series 2002A (the **"2002A Bonds"** and, together with the 2001A Bonds and the 2001B Bonds, the **"Bonds"**) issued pursuant to the Bond Indenture in the initial aggregate principal amount of $25,475,000; and

viii.    certain Loan Agreement dated July 1, 2001 (as supplemented and amended, the **"Loan Agreement"**), by and between the Authority and the Debtors, pursuant to which CGRMC covenanted to make payments at such times and in such amounts so as to provide for the payment of the principal of, premium, if any, and interest on the

Bonds and any fees, costs and expenses related thereto (collectively, the "**Prepetition Obligations**").

ix. Pursuant to the Bond Financing Documents, certain accounts were established and are held in trust by the Trustee for the benefit of the holders of the Bonds (collectively, the "**Trustee-Held Funds**"), including, without limitation, (i) a certain "Revenue Fund", (ii) a certain "Interest Account", (iii) a certain "Principal Account", and (iv) a certain "Bond Reserve Account" (each as defined in the Bond Indenture). The Trustee believes that the Trustee-Held Funds are not property of the Debtors' estates. The Debtors acknowledge that the Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds, and is entitled to access the Trustee-Held Funds in accordance with the Bond Financing Documents.

x. To the extent Prepetition Collateral includes negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in the possession, custody or control of Casa Grande, it is cash collateral for purposes of the motion (as defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral")

60. The Debtors have negotiated a stipulated form of Interim Order and stipulated budget with the Trustee for the use of Cash Collateral.

61. Use of Cash Collateral is critical to the Debtors' operations and ability to fund these chapter 11 cases pending the anticipated Sale. Interim Cash Collateral is needed for, among other things, (i) Hospital operations, (ii) patient care, (iii) funding payroll for doctors, nurses and other staff, (iv) purchasing medical supplies and pharmaceuticals, (v) paying for blood supplies, (vi) maintaining utilities, (vii) paying vendors critical to operations, and (viii) administering these cases.

62. Without such capital, the Debtors would not be able to fund these Cases or pay for the services and expenses necessary to preserve and maximize the value of the Assets. Indeed, absent sufficient funding to support their businesses, the Debtors' ability to consummate the Sale will be significantly hampered, if not completely destroyed, and the value of the Assets will quickly erode. Access to immediate Cash Collateral is thus not only necessary, it will help maximize ultimate recovery for creditors through the Sale.

63. The Interim Order also provides the Trustee with adequate protection, to the extent of any diminution in the value of the Trustee's Prepetition Collateral as more fully set forth in the motion. The Trustee has explicitly consented to the adequate protections proposed in the motion. Moreover, the proposed adequate protections are reasonable, appropriate and sufficient to satisfy the standard of "adequate protection" and maintain the value of the Prepetition Collateral.

64. Based on the foregoing, I believe that the relief requested through the motion is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors and their estates and creditors.

**2. *Motion to Obtain Emergency and Further Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. §§105 and 364(c)(1), Modify the Automatic Stay and Schedule a Final Hearing***

65. DIP Financing and Interim DIP Financing are critical to the Debtors' operations and ability to fund the Cases pending the Sale.

66. The Debtors need immediate additional capital (i) for ordinary course operations, such as patient care services, funding payroll for doctors, nurses and other staff, purchasing medical supplies and pharmaceuticals, paying for blood supplies, maintaining utilities, and paying vendors critical to operations (the "**Critical Operations During Bankruptcy**") and (ii) to pay administrative expenses, including U.S. Trustee and professionals' fees, in accordance with an agreed Budget.

1  67. Without this relief, the Debtors' ability to operate, provide medical services
2  to the public, and preserve the value of their businesses will be immediately and
3  irreparably jeopardized, resulting in significant harm to the Debtors' estates and creditors.
4  In fact, such funding is necessary to maintain the going-concern value of the Debtors'
5  estates and ensure a successful Sale, which in turn will maximize recovery for the
6  Debtors' creditors.

7  68. Banner has agreed to provide DIP Financing in an aggregate principal
8  amount of $6,199,845[4] pursuant to that certain Phase 2 Debtor In Possession Financing
9  Agreement (the "**DIP Financing Agreement**"). The Debtors negotiated the Dip
10  Financing Agreement through a good faith arm's length process.

11  69. Banner is willing to lend on an unsecured basis, but requires superpriority
12  administrative expense status, which the Debtors believe is appropriate given the
13  circumstances, the short time frame to Sale, and the unwillingness of other parties to
14  provide financing on equal or better terms.

15  70. Indeed, while the Debtors were seeking buyers in Fall of 2013, the Debtors
16  and their advisors also ran an extensive process seeking lenders who would provide
17  financing to sustain hospital operations through closing of a sale or merger. The Debtors
18  solicited proposals and term sheets, and received a number of submissions from
19  prospective lenders. The Debtors paid work fees to two potential lenders in order to
20  negotiate definitive lending documents on a competitive basis. Most proposals received
21  required a grant of security interests to secure the lending; indeed, some proposed a loan
22  that would have primed the prepetition liens securing repayment of the bonds.

23  71. In December 2013, the Debtors approached the potential buyers or strategic
24  partners who had expressed the highest levels of interest in order to request working
25  capital advances on an unsecured basis. Certain interested parties declined.

26

---

[4] As more fully described in the motion, the aggregate principal amount of the Phase 2 DIP Financing and
Phase 1 Bridge Financing (defined below) together is not to exceed $9,507,845.

Unsurprisingly, the financing proposals received from prospective purchasers or strategic partners were tied to a transaction with those parties. Accordingly, the Debtors evaluated proposals for financing from potential purchasers or strategic partners in conjunction with the overall proposed transaction. Not only was Banner's overall proposal the best in the Debtors' judgment, but the financing proposal from Banner was more favorable than any received from a third-party lender because it proposed to lend on an unsecured basis.

72. The DIP Financing Agreement provides for a release of any claims or causes of action by Debtors. That release provision will be sought as part of the final approval order of the DIP Financing Agreement, but not on an interim basis. Debtors are aware of no claims against Banner arising out of negotiation of the APA, DIP Financing Agreement, Plan Support Agreement, or any other aspect of the Banner Transaction or any other connection between the parties. Debtors believe Banner's request for confirmation that there will be no such claims as a condition to advancing additional money is reasonable and appropriate.

73. Immediate additional capital is critical to the Debtors' operations and their ability to provide medical services to the public and make it to Sale. Interim DIP Financing is needed for, among other things, Critical Hospital Operations During Bankruptcy.

74. To meet these more immediate needs, the Debtors seek authorization to obtain DIP Financing on an interim basis. The relief is appropriate and provides for the best available financing option under the circumstances.

### 3. *Motion to Authorize Continued Use of the Debtors' Cash Management System and Bank Accounts, and Interim Waiver of Certain Bank Account Requirements*

75. In the ordinary course of business prior to the Petition Date, the Debtors maintained nineteen bank accounts (the "**Bank Accounts**"). The Debtors' Bank

1  Accounts are held at four banks:  JP Morgan Chase & Co.; Great Western Bank; Morgan

2  Stanley; and Wells Fargo & Company.

3      76.    The accounts at Great Western Bank and JP Morgan Chase & Co. are

4  operational accounts.

5      77.    The accounts at Morgan Stanley and Wells Fargo & Company are collateral

6  accounts.

7      78.    Certain of the Bank Accounts serve as the lockbox accounts for cash

8  collateral collected from all payors, including Noridian, who is the financial intermediary

9  that administers reimbursement by Medicare on behalf of the Debtors.

10     79.    The Debtors have no investment accounts.

11     80.    The Bank Accounts comprise a simple and standard cash management

12  system that is designed so that the Debtors can efficiently collect funds, transfer and

13  consolidate them as needed, and make disbursements to creditors (the "**Cash**

14  **Management System**").

15     81.    Although the Debtors utilize numerous Bank Accounts as part of their cash

16  management system, they carefully account for all payments and receipts of each

17  individual Debtors entity.  Transactions between and among the Debtors and their non-

18  debtor affiliates are recorded as intercompany payables and receivables so that the

19  amounts owing to and from each individual entity can be accurately traced and

20  determined at all times.  Moreover, the Debtors have accounting protocols in place to

21  ensure that transactions are properly recorded in the Debtors' books and records.

22     82.    These accounting procedures and use of the Bank Accounts as part of the

23  cash management systems have been audited on a yearly basis by Moss Adams, LLP, a

24  regional firm of certified public accountants.

25     83.    The Debtors' current Cash Management System allows the Debtors to: (a)

26  efficiently control funds; (b) ensure the availability of funds; (c) reduce administrative

expenses by facilitating the movement of funds and the development of timely and

accurate account balance; and (d) ensure strong relationships with patients, health insurers, Medicare and AHCCCS, and employees by providing consistent and predictable delivery of funds. Further, the use of the Cash Management Systems reduces interest expense by enabling the Debtors to utilize all funds within the system rather than relying upon short-term borrowing to fund the Debtors' cash requirements.

84.     It is my understanding that the U.S. Trustee Guidelines require a chapter 11 debtor to, among other things, close existing bank accounts, establish new bank accounts, and utilize new checks for all such new accounts bearing the designation "Debtor in Possession" and containing other information pertaining to the case. The Debtors request waiver of the requirement that the Debtors open new bank accounts and authorization to, instead, stamp or print its current check stock with "Debtor in Possession" and the case number under which this case is being administered.

85.     I believe the Debtors' existing cash management procedures are crucial to the uninterrupted transition of the Debtors' operations and business into chapter 11. Changing bank accounts and creating a new cash management system would not only cause the Debtors to incur significant and unnecessary costs, but could hinder operations when management's efforts should focus primarily on operational stability and patient care.

86.     To require opening of new bank accounts would also severely disrupt the receipt of all payments, including Medicare and AHCCCS reimbursements. Specifically, in the ordinary course of the Debtors' business, a significant lag exists between the time the Debtors submit claims for payment and when they receive cash reimbursements. For instance, all payors, governmental and commercial, make reimbursements to the specific Bank Accounts listed by the Debtors in their submissions. Closing the Bank Accounts would in turn require the Debtors to re-submit all payor information for which they have not yet received reimbursements. In addition to this burdensome task, re-submitting

1  information would create significant additional delays in receiving reimbursements on
2  top of those that already exist.

3      87.    A new cash management system could also cause confusion, disrupt
4  payroll, introduce inefficiency when efficiency is most essential, and strain the Debtors'
5  relationships with critical third parties as a result. Thus, through its cash management
6  motion, the Debtors seek authorization to continue use of bank accounts, its cash
7  management system and underlying management of its cash receipts and disbursements,
8  and business forms and checks as they were handled immediately prior to the Petition
9  Date.

10      88.    The Debtors believe that they can efficiently pay taxes out of their existing
11  Bank Accounts. The Debtors believe any creation of new debtor-in-possession accounts
12  designated solely for this purpose would be unnecessary and inefficient.

13  **D.    Motions Related to Employees, Physician Groups, and Independent Care**
14  **Providers**

15      *1.    Motion Seeking Authorization: (i) For Payment of Payroll*
*Obligations and Certain Paid Time Off Obligations; and (ii) To*
16  *Honor Business Expense Obligations, Paid Time Off Obligations,*
*and Sick Time Obligations in the Ordinary Course of Business;*
17  *and (iii) to Direct All Banks with Which the Debtors Maintain*
18  *Accounts to Satisfy Such Obligations to Honor and Pay All Checks*
*Presented for Payment or Electronic Payment Requests from Such*
19  *Accounts Relating to these Obligations.*

20      89.    The Debtors have filed a motion seeking entry of an order, among other
21  things, (i) authorizing the Debtors to pay, in their sole discretion, prepetition employee
22  wages and salaries as well as related obligations (the "**Payroll Obligations**") and unused
23  accrued paid time off obligations for which employees have elected to receive a cash
24  payout (the "**PTO Cashout Obligations**"), collectively up to the statutory cap set forth in
25  section 507(a)(4) of title 11 of the United States Code (the "**Bankruptcy Code**") per
26  employee; (ii) authorizing the Debtors to honor, in their sole discretion and consistent

with the ordinary course of business, certain expense reimbursement obligations owed to employees (the "**Business Expense Obligations**"), all other paid time off obligations (the "**PTO Obligations**"), and sick time obligations (the "**Sick Time Obligations**"); and (iii) authorizing and directing the Banks to honor and pay all checks presented for payment or electronic payment requests from such accounts relating to these obligations.

90.     In order to achieve a successful reorganization, it is essential that the Debtors' employees (the "**Employees**") work with the same or greater degree of commitment and diligence as they did prior to the Petition Date. The Debtors' payment of the Payroll Obligations and PTO Cashout Obligations is critical to ensuring that the Debtors remain an attractive employer to the Debtors' Employees. If this relief were not granted, I believe significant deterioration in morale among Employees would result at this time, which undoubtedly would have a devastating impact on the Debtors, their patients, the value of estate assets, and the Debtors' ability to reorganize.

91.     The Debtors intend to retain the Employees receiving payment of pre-petition claims in the ordinary course of their businesses.

92.     The Debtors' ability to reorganize and continue to provide quality medical services to the community depends in part upon the continued efforts of approximately 800 Employees, consisting of physicians, nursing, finance, IT, billing, collections, accounting, administrative, technicians, etc. As of the Petition Date, Debtors have approximately 700 full-time Employees.

93.     The Debtors pay Employees via either automatic-deposits or checks every two weeks. Of the approximately 800 Employees, approximately 35 employees receive compensation through delivery of checks.

94.     Payroll for the Debtors' Employees approximates $1.3 million and is paid on a biweekly cycle. The Debtors' next payroll is scheduled to be made on February 7, 2014 to cover the period from January 19, 2014 to February 1, 2014. Due to the timing of the Petition Date, Employees will be owed prepetition wages or salary payments.

95.     In the ordinary course, the Debtors reimburse their Employees for certain business expenses incurred in the scope of their employment, *i.e.*, the Business Expense Obligations. As of the Petition Date, the outstanding prepetition Business Expense Obligations are de minimus and are estimated to not exceed a few thousand dollars.

96.     Certain of the Debtors' Employees have unused accrued paid time off since their date of hire and are eligible to receive it as of the Petition Date, *i.e.*, the PTO Obligations. As of January 31, 2014, the aggregate value of PTO Obligations is approximately $1.5 million.

97.     Certain of the Debtors' Employees have unused major medical paid time since their date of hire, *i.e.*, the Sick Time Obligations. Employees are eligible to utilize this time as of the Petition Date according to our Major Medical Policies. Sick Time Obligations are not recorded on the books as they are only used and paid if the Employee meets certain criteria.  If Employees leave employment, any remaining balance is forfeited.

98.     Routinely, CGRMC deducts amounts that they are directed to transmit to third parties, such as Social Security, federal and state income taxes, employee savings plan contributions and garnishments (the "**Withholdings**"). Typically, the Withholdings that arise from Casa Grande's payroll obligations approximate $1.3 million per month, including approximately $210,000 per month for employee savings plan contributions. In the event the Court authorizes the Debtors to pay the obligations set forth herein, the Debtors intend to continue to deduct and pay the Withholdings consistent with the ordinary course of its business.

99.     Each Employee is only entitled to payment on account of Payroll Obligations and PTO Cashout Obligations in the aggregate of up to $12,475.

100.     Importantly, payment of Payroll Obligations and PTO Cashout Obligations satisfy many claims that would be entitled to priority under Section 507(4)(a) of the Bankruptcy Code in any case. I believe authorizing the Debtors to pay these obligations

1  in accordance with the Debtors' prepetition business practices is in the best interests of
2  the Debtors, their Employees, creditors, patients, community, and all other parties in
3  interest, and would enable the Debtors to continue to operate their business with minimal
4  disruption to their labor force.

### 2. Motion for Authorization to Pay Certain Prepetition Obligations Owed to Physician Groups & Other Independent Care Providers

101.   The Debtors also seek authority to pay, in their sole discretion, certain prepetition obligations owed to physician groups (collectively, the "**Physician Group Obligations**") and other independent care providers who are essential to the provision of patient care (collectively, the "**Other Independent Care Provider Obligations**").

102.   To supplement its workforce, the Debtors engage certain physician groups (the "**Physician Groups**") to provide integral and necessary services. These Physician Groups provide services in practice areas including anesthesiology, pulmonology, orthopedic surgery, dialysis, cardiology, stroke, pathology, urgent care, sleep lab and emergency room.

103.   Each one of the Physician Group Obligations varies according to the agreement associated with respect to each Physician Group.

104.   Further, the Debtors engage certain independent care providers to provide nursing, pharmacy, information technology, physical therapy, laboratory services, security and medical technicians (the "**Other Independent Care Providers**").  The compensation owed to each one of the Other Independent Care Providers varies according to each Other Independent Care Provider's agreement with the Debtors.

105.   As of the Petition Date, the Debtors estimate accrued and unpaid Physician Group Obligations and Other Independent Care Providers Obligations to approximate $90,000 and $390,000 for one pay period, respectively.

106.     The relief sought in this motion is crucial to the Debtors' business and reorganization efforts because the Debtors' operations require that the Physician Groups and Other Independent Care Providers work as diligently throughout this case as they did prior to the Petition Date.  Given the exigencies of the Debtors' chapter 11 process, it would be difficult, time-consuming, and impractical to replace the Physician Groups and Other Independent Care Providers who are an important part of the Debtors' team. Moreover, replacement of Physician Groups or Other Independent Care Providers could negatively impact the timeliness and quality of operations, as well as patient care that the Debtors have maintained over the years and for which the Debtors are recognized in the community.

107.     The Debtors operations occur in a small community and the Physician Groups and Other Independent Care Providers that the Debtors seek to pay are the only groups of their kind that service the Casa Grande area.

108.     The Debtors contract with the Physician Groups and the Other Independent Care Providers and then apply for payment from various governmental agencies for these services. When the Debtors receive payment for these services they write monthly checks to these Physician Groups and the Other Independent Care Providers. The Debtors act as a conduit because the services are performed in the Debtors' facilities, but the Debtors only hold the funds because of the services performed by these Physician Groups and Other Independent Care Providers.  Accordingly, the Debtors have an obligation to pay these funds to the Physician Groups and the Other Independent Care Providers.

109.     The Debtors can easily identify which of the billed entries for each Physician Group or Other Independent Care Provider are paid or rejected by the various governmental agencies and payment is reduced accordingly.

110.     Banner, as the proposed purchaser for the Debtors, requires that it must maintain its contractual relationship with Physician Groups and the Other Independent Care Providers.

111. Banner has indicated that as part of the purchase it will seek the assumption and assignment of these contracts and as such the Debtors will have to cure any default.

112. Attached to this Declaration as **Exhibit A** is an accurate list of Physician Group Obligations and Other Independent Care Providers Obligations the Debtors seek payment for.

113. I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their creditors, their patients, their community, and all other parties in interest, and would enable the Debtors to continue to operate their business with minimal disruption to their provision of quality patient care.

**E.    Certain Other Motions**

> *1.    Motion Seeking to Prohibit Utility Providers from Altering, Refusing, or Discontinuing Services; (ii) Establishing Procedures for Providing Deposits to Requesting Utilities; (iii) Deeming Utilities to have Adequate Assurance of Payment; and (iv) Establishing Procedures for Resolving Request for Additional Assurance of Payment*

114. The Debtors have also filed a motion seeking a court order (i) prohibiting utility providers (the "**Utility Companies**") from altering, refusing, or discontinuing services; (ii) deeming utility providers to have adequate assurance of payment; and (iii) establishing procedures for providing deposits to requesting utilities and for resolving requests for additional assurance of payment.

115. Ordinarily, the Debtors pay each of the Utility Companies on a monthly basis.

116. As of the Petition Date, the Debtors have no outstanding debts with the Utilities Companies.

117. The Debtors have a consistent payment history with the Utility Companies for essential utility services.

118. It is my belief that an adequate assurance deposit (as further explained in the motion) as well as the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the utility companies.

119. In order to prevent cessation of necessary utility services, the effect of which would undoubtedly be harmful to Hospital operations and the provision of patient care, Debtors seek an opportunity to establish procedures for providing deposits to Utility Companies requesting adequate assurance and resolving requests for additional assurance of payment without facing the threat of imminent termination of essential utility services. The orderly process contemplated by the proposed procedures is necessary for a smooth transition by the Debtors into chapter 11 and will aid in their restructuring efforts. Moreover, the procedures will ensure that all parties act in good faith by establishing a fair process.

120. Severe disruptions will result in the disruption of vital services provided by the Debtors if the Utility Companies are permitted to terminate utility services on the 21st or 31st day after the Petition Date.

121. The Debtors fully intend to timely pay all post-petition obligations owed to the Utility Companies.

122. The Debtors expect that post-petition receipts and the DIP Financing will be sufficient to pay all post-petition utility obligations.

123. Attached as **Exhibit B** is a list of substantially all of the Utility Companies that provide Utility Services to the Debtors as of the Petition Date.

### 2. *Motion to Authorize Payment of Prepetition Claims of Certain Critical Vendors*

124. The Debtors have also filed a motion seeking authority to pay, in Debtors' sole discretion, certain critical vendor claims in the ordinary course of business.

125. In order to continue operating its business, the Debtors must rely on certain suppliers (the "**Critical Vendors**") that provide the Debtors with certain goods and

1  services. The Critical Vendors provide, among other things, essential medical supplies
2  and services necessary to the Debtors' operation as an acute care Hospital. These vendors
3  include, without limitation: medical supplies providers, drug providers, blood providers
4  and equipment providers. Certain of these vendors are the sole source of either critical
5  supplies or services. Unless their prepetition claims are satisfied, I believe the Critical
6  Vendors will refuse to supply the Debtors post-petition. Moreover, replacing the Critical
7  Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible. Even
8  if alternative sources are available, a transition to adopting such alternative sources would
9  likely disrupt the essential services and medical supplies at an incremental cost to the
10 Debtors and have a detrimental effect on the Debtors' operations and their ability to
11 reorganize.

12     126.    The Debtors have conducted an extensive analysis and review of its
13 immediate supply and service needs using the following criteria: (i) whether the vendor is
14 a sole source provider, (ii) whether, if a vendor is not a sole source provider, the Debtors
15 have sufficient inventory or in-house capabilities to sustain operations while a
16 replacement vendor is put in place, (iii) whether the Debtors receive favorable pricing or
17 terms from a vendor such that a replacement vendor would impose higher costs on the
18 Debtors, (iv) whether quality constraints prevent the Debtors from receiving goods or
19 services from alternate sources within a reasonable time, (v) whether a vendor is
20 otherwise contractually obligated to continue providing goods or services to the Debtors,
21 (vi) whether a vendor that has met the standards set forth above is likely to refuse to
22 continue business with the Debtors if their prepetition unsecured claim is not paid, and
23 (vii) whether Debtors' operations and the health and safety of the Debtors' patients would
24 be significantly disrupted by replacement of goods and services post-petition.

25     127.    After careful consideration, the Debtors have identified 12 Critical Vendors
26 out of 1500 vendors that provide goods and services essential to the Debtors' operations.
   The interruption of these goods or services would result in irreparable harm to the

1  Debtors and their patients. The Critical Vendors and their critical function are attached as
2  **Exhibit C** to this Declaration.

3       128.   The claims of Critical Vendors do not exceed $3 million in the aggregate.

4       129.   If the relief sought in this motion is not approved, the probability of harm is
5  great because if the Critical Vendors are not paid in the ordinary course, they may stop
6  supplying goods and services to the Debtors, and this will disrupt Debtors' operations
7  along with patient care.

8       130.   There are no real alternate vendors or suppliers to replace existing critical
9  vendors in a reasonable timeframe without expending significant funds or affecting the
10  quality of care.

11       131.   Many physicians would refuse to work without the products from certain
12  critical vendors. Moreover, any interruption as such could potentially devastate the health
13  and welfare of the Debtors' patients.

14       132.   All of the Critical Vendors are counter-parties on contracts with the
15  Debtors.

16       133.   Further, certain of such Critical Vendors have provided the Debtors within
17  twenty (20) days prior to the Petition Date with materials, supplies, goods, products, and
18  related items in the approximate amount of $750,000, that are essential to the sustained
19  operations of the Debtors.  Accordingly, I am told such Critical Vendors would be
20  entitled to an administrative priority claim under Bankruptcy Code section 503(b)(9) and
21  the relief requested would simply alter the timing of payments that such vendors are
22  already entitled to receive by statute.

23       *3.     Motion Authorizing, but not Requiring, Debtors to Pay and
        Continue Paying Refunds to Patients and Insurers in the Ordinary*
24       *Course of Business*

25

26

134. The Debtors, through their motion, seek court authority, but not direction, to pay and continue paying undisputed patient and insurer overpayments in the ordinary course of business.

135. The Debtors hold funds relating to services rendered to patients of the Hospital (the "**Patients**"), including overpayments made by Patients and overpayments made on behalf of Patients.

136. It is customary for the Debtors to refund undisputed overpayments and/or deposits paid by Patients ("**Patient Refunds**") and by their insurers ("**Insurer Refunds**," and, collectively with the Patient Refunds, the "**Refunds**").

137. The Debtors may need to pay Refunds under a variety of circumstances, such as where: (i) a Patient pays upon receipt of services and the Debtors are later reimbursed by such patient's insurance provider ("**Insurer**"), (ii) a Patient overpays deductibles or copayments, or (iii) a Patient receives financial assistance for services but has already paid for a portion of the services received. The Debtors may need to pay Insurer Refunds when Insurers overpay for a service provided to an insured Patient and thereby become entitled to a Refund.

138. Certain Patients or Insurers may have the right to recoup overpayments made in lieu of refunds creating unnecessary administrative burdens in monitoring recoupment taken against future payments and reconciling them with past entitlements to refunds.

139. In the twelve months ended December 31, 2013, the Debtors returned Refunds in a total amount of approximately $642,055. This amount was comprised of $200,275 in Patient Refunds and $441,780 in Insurer Refunds. The Debtors estimate that, as of the Petition Date, they owe $460,000 in Refunds in the ordinary course of business.

140. While Refunds owed to any individual Patient or Insurer are modest in amount, the number of recipients is substantial. Therefore, the Debtors have not prepared

a list of the individual Patients and Insurers entitled to Refunds as the administrative burden of doing so would far outweigh any benefit to the estate.

141. It is estimated that not more than 23 claims in excess of $2,775 exist based on the previous year's refunds. Notably, all such claims are on account of Insurer Refunds.

142. Failure to meet its Patients' expectations by not refunding undisputed overpayments would result in severe and irreparable harm to the positive patient relations that the Debtors have invested heavily to develop and maintain.

143. It is important that the Debtors send a clear message of stability to their patients and avoid the perception that amounts owed to patients will be withheld and used to fund the Debtors' bankruptcies.

144. These funds are property held for others.

145. By seeking this authorization at the outset of their bankruptcy case, the Debtors seek to alleviate potential concerns regarding non-payment of these funds to their rightful owners. It is my belief that nonpayment of or failure to turnover of these funds in the ordinary course of business would be detrimental to the relationships with patients and destructive to the Debtors' business operations by creating unnecessary administrative burdens in monitoring recoupment taken against future payments and reconciling them with past entitlement to refunds and relationships with patients.

146. Furthermore, as to the individuals receiving Patient Refunds, a vast majority, if not all of them, are owed on account of deposits. Therefore, payment of Patient Refunds should likely only affect the timing of payment.

## PART IV - CONCLUSION

In furtherance of its reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.

Dated: February 5, 2014

*Rona Curphy*

Rona Curphy

# EXHIBIT A

## CGRMC Physician Staffing

| Name | Description |
| --- | --- |
| EMP - Urgent Care | Urgent Care Doctors |
| Heart Health | Cardiologists |
| SONORAN DESERT ANESTHESIA | Certified Registered Nurse Anesthetists (CRNAs) |
| BJX4 (Dr. Matanki) | Orthopedic Surgeon |
| Western Skies Dialysis | Dialysis Staffing |
| Mayo - Telestroke | Specialty stroke physicians |
| DR. LOWRY | Anesthesiologist |
| DR. DAVENPORT | Anesthesiologist |
| DR. SHRIVASTAVA | Anesthesiologist |
| DR. KAPSOS | Anesthesiologist |
| DR. PUNNAKKATTU (RAJ) | Stipend for Vice Chief of Pulmonology, and Lab Directorship for Sleep Lab |
| DR. BHAKTA | Part-time Anesthesiologist |
| EMP - ED | Medical Directorship of Emergency Department |
| DISTRICT MEDICAL GROUP, INC | Medical Directorship, Pathology |
| EKG Reading Panel | Cardiologists |
| CENTRAL AZ HEART SPECIALISTS | Medical Directorship |
| Adult Medicine | Various Doctors |
| Dr. Givre | Director Fee for Pulmonologist |
| DR. SALISBURY | Stipend for the Vice Chief of OBGYN |

1

## CGRMC Independent Contractors

| Name | Description |
|------|-------------|
| O'Grady-Peyton | Nurses |
| B.E. Smith | Cath Lab Director |
| Aramark | BioMed |
| Huff Pharmacy | Interim pharmacy director |
| Desert Medical Lasers | Operating room laser and staff |
| Securitas | Security Officers |
| Morgan Hunter | Pharmacy IT |
| Springboard | Cath Lab Nurse |

1

# EXHIBIT B

**CGRMC Utility Providers**

| # | Vendor Name |
|---|---|
| 1 | AZ Water Company |
| 2 | APS |
| 3 | Cox Communications |
| 4 | Century Link |
| 5 | Integra Telecom |
| 6 | Trans-West Network Solutions |
| 7 | Southwest Gas |
| 8 | City of Casa Grande |

1

# EXHIBIT C

**CGRMC Critical Vendors**

| # | Vendor Name | Description |
|---|---|---|
| 1 | CARDINAL | Drugs and Medical Supplies |
| 2 | STRYKER | Orthopedic trauma and surgery supplies |
| 3 | UNITED BLOOD SERVICES OF AZ | Blood Provider |
| 4 | SYSCO FOOD SERVICES OF AZ | Patient Food Provider |
| 5 | BOSTON SCIENTIFIC CORP. | Stents, Guidewires, Endoscopy supplies, cytology supplies, forceps, etc. |
| 6 | SIEMENS | Respiratory Therapy supplies |
| 7 | SONORA SURGICAL SERVICES, LL | Lithotripsy service and supplies |
| 8 | U.S. FOODSERVICE, INC. | Patient Food Provider |
| 9 | SYNTHES USA | Orthopedic surgery supplies |
| 10 | ABBOTT LABS (VASCULAR) | Interventional cardiology supplies for Cath Lab and Interventional Radiology Lab |
| 11 | GE MEDICAL SYSTEMS | Electrodes, EKG Supplies, etc. |
| 12 | BIO-RAD LABORATORIES | Lab reagents and markers |

1